UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL HARBOR GP, LLC,** *doing business as* **METROPOLITAN GAMING,**<br><br>Plaintiff,<br><br>v.<br><br>**GOVERNMENT OF THE DISTRICT OF COLUMBIA,** *et al.*,<br><br>Defendants. | Civil Action No. 14-2108 (JEB) |

**MEMORANDUM OPINION**

No one buys an instant lottery ticket expecting he is guaranteed to scratch off a million dollars. But everyone who buys a ticket expects to have a fair chance, however slim it may be. In similar fashion, when the District of Columbia issues a request for proposals from businesses to provide instant lottery tickets, prospective bidders expect they will each have a shot at winning the contract. Plaintiff National Harbor, LLC, doing business as Metropolitan Gaming, is a black-owned business that here alleges that the District deprived it of that fair chance. Plaintiff claims that the District, in altering the requirements midway through the bidding procedure in order to exclude Metropolitan from any possibility of winning, unlawfully discriminated against it.

In response to the District's maneuvers, Plaintiff twice filed protests with the Contract Appeals Board, the administrative agency that reviews the city's procurement process. Although the CAB ultimately dismissed the protests, Metropolitan nonetheless brought this lawsuit alleging that the city had discriminated against it in violation of 42 U.S.C. §§ 1981 and 1983. In response, the District now moves to dismiss, arguing that Plaintiff lacks standing, did not

1

adequately exhaust its administrative remedies, and is precluded from bringing suit in federal court by the CAB's prior judgment.

The Court believes dismissal is unwarranted at this stage. Metropolitan does have standing here, and requiring administrative exhaustion or invoking claim preclusion is inapt given the statutory scheme in place and the particular nature of Plaintiff's claim of unlawful discrimination arising under §§ 1981 and 1983. Metropolitan, nevertheless, faces significant hurdles going forward, given that the CAB has already adjudicated a considerable portion of the facts in a manner adverse to it, which findings may ultimately bind the Court.

## I.   Background

At the motion-to-dismiss stage, the Court must draw on the facts as alleged by Plaintiff, but it also relies on the CAB's related Order of March 6, 2015. See Protests of: Rmd Nat'l Harbor Gp, LLC d/b/a Metro. Gaming, DCCAB No. P-0967, 2015 WL 1090168 (D.C.C.A.B. Mar. 6, 2015) [hereinafter "DCCAB Protest"]. The Board's Order is a public record, and the Court may take judicial notice of it in considering this Motion. See Covad Communications Co. v. Bell Atl. Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005) (taking judicial notice of facts in public record at motion-to-dismiss stage); see also 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004).

Before detailing the specific allegations here, some brief background on the District's procurement process and the status of Certified Business Enterprises is in order.

### A.   Procurement Contracts

The District uses procurement contracts for a range of government services performed by outside entities. These are overseen primarily by its Office of the Chief Financial Officer

(OCFO). See Am. Compl., ¶ 5. This includes operations for the District of Columbia Lottery Board ("Lottery Board"). See id.

As alleged in its Amended Complaint, Metropolitan is a black-owned limited-liability company organized under the laws of Delaware and properly registered to do business in the District of Columbia. See id., ¶ 3. Between 2009 and April 2015 — including the period during which the alleged events took place — Metropolitan was recognized as a Certified Business Enterprise (CBE) by the District of Columbia Department of Small and Local Business Development (DSLBD). See id. Metropolitan concedes that it does not at present maintain a CBE certification. See id.

Both parties agree that Metropolitan's CBE status is of central relevance to this case. Plaintiff's claim of unlawful discrimination rests on the District's alleged gambit of sidestepping its standard procurement process, which gives preference to CBE-certified entities. As Plaintiff details in its Amended Complaint, when the city seeks to contract with outside entities, the DSLBD typically requires that all respondents to solicitations be either CBE-certified themselves or else provide a subcontracting plan that includes at least 35% CBE-certified subcontracting. See id., ¶¶ 9 & n.2, 16; D.C. Code §§ 2-218.46(a)(2)(A)-(B). According to the DSLBD, the purpose of the CBE certification is to "provide[] preference to District-based firms pursuing District Government issued procurement opportunities . . . ." CBE Program History, Department of Small and Local Business Development, http://www.dslbd.dc.gov/service/cbe-program-history/ (last visited Aug. 13, 2015); see also Am. Compl., ¶ 12. The DSLBD grants CBE certification to businesses that demonstrate that a sufficient share of their assets, sales, and/or employees are located within the District of Columbia. See Am. Compl., ¶ 12. Under ordinary circumstances, unless the District is granted a waiver from this requirement, the CBE mandate

3

may trump otherwise-competitive bids and proposals that lack participation by a CBE-certified contractor or subcontractor.

Here, the claim of discrimination hinges on showing that Defendant voided the original CBE requirement in order to exclude Metropolitan, the only CBE-certified business submitting a bid to provide instant-lottery ticket services in response to the District's Invitation for Bids. See id., ¶¶ 28, 36, 63. While Defendant's initial solicitation contained the standard CBE requirement, which could be met by use of CBE-certified subcontractors like Metropolitan, Plaintiff alleges that the District later sought and obtained a waiver from these requirements so as to exclude it from having the opportunity to submit a bid. It claims that Defendant then directly initiated negotiations with all three of the other bidders, each of which is a white-owned, non-CBE-certified business. See id., ¶¶ 42, 66. As Plaintiff believes that the full history of the events is necessary to understand its discrimination claim, the Court recites it in some detail.

B. Instant-Lottery Ticket Services

Between 2012 and 2014, the District's OCFO — the office responsible for soliciting contracts for the Lottery Board — issued several solicitations in order to secure a long-term contract for instant-lottery ticket services in the District. See id., ¶ 5. OCFO issued the first solicitation relevant to this lawsuit on October 22, 2012. See id., ¶ 6. Its Request For Proposal (RFP) No. CFOPD-13-R-003 sought provision of instant-ticket games and related services, including ticket design, production, security, delivery and warehousing, distribution, marketing, and sales support. See id. Although Plaintiff did not submit a bid, this RFP is relevant for two reasons. First, OCFO deemed one of the proposals it received "non-responsive" because the bidder was not CBE certified and did not include a CBE subcontracting plan. See id., ¶ 9 & n.2. According to Plaintiff, this is significant because it indicates that OCFO initially required that a

4

successful proposal contain a CBE contracting or subcontracting plan, as OCFO has expressly required with prior RFPs. See id., ¶ 12. Second, Plaintiff highlights this RFP because it did not require that the lottery-ticket service provider be a ticket manufacturer — something Metropolitan Gaming is not, but which the other non-CBE-certified and white-owned businesses are. As this first RFP contained both a CBE-contracting-plan requirement and no specification that potential bidders be capable of manufacturing instant lottery tickets themselves, therefore, Metropolitan would have been eligible to win the contract. Indeed, given the CBE preference, presumably it would have had a very good chance as compared to other non-CBE-certified bidders — either as a contractor itself or as a subcontractor working in a short-term joint venture with another bidder, a standard industry practice. See id., ¶¶ 12-14.

Dissatisfied with the responses to this first RFP, the District awarded a short-term, four-month contract in March 2013 to one of the bidders to fill the gap until a longer-term contract could be secured. See id., ¶ 10. On July 20, 2013, OCFO issued a second RFP, No. CFOPD-13-R-030. See id., ¶¶ 10, 11. This one also "expressly permitted (and encouraged) subcontracting between lottery ticket manufacturers and small businesses or CBEs by incorporating the subcontracting and CBE requirements of DC Code § 2-218.46." Id., ¶ 11. As Plaintiff notes, once again the District's RFP did not seek an exemption from the CBE requirements, and at least one submitted bid included a joint venture with a CBE-certified subcontractor. See id., ¶¶ 11-13. After receiving this bid, OCFO canceled the second RFP on December 11, 2013, claiming that the proposal of one bidder was "'unsatisfactory to the District on the standpoint of price,' not because of the [requirement of] CBE participation in the transaction." Id., ¶ 15. Metropolitan presumably raises this point to insinuate that had the CBE requirement proved burdensome for the OCFO, it should have expressly articulated this at the time of cancellation. In failing to do

5

so, this Court understands Plaintiff as alleging that this is evidence of OCFO's flimsy justification for its subsequent waiver request.

After it withdrew the second RFP, OCFO submitted a pre-solicitation waiver request to the DSLBD asking it to waive the mandatory subcontracting and CBE requirements in its subsequent Invitation for Bid (IFB). See id., ¶ 16. OCFO claimed that the Lottery Board's minimum needs had changed, and it now needed a bidder that directly manufactured instant tickets — a proprietary and patented process that would exclude businesses like Metropolitan that do not themselves manufacture such tickets. See id., ¶¶ 21-23. According to Plaintiff, OCFO stated that "after conducting market research, no manufacturers of the instant tickets would be willing to disclose to a third party intermediary the proprietary nature of their ticket technologies." Id., ¶¶ 30 & n.5. As a result, OCFO determined that no subcontracting opportunities would be available under the IFB. See id., ¶ 19. Furthermore, according to the District, no business capable of manufacturing instant tickets was CBE certified. See id., ¶ 17. Since none of the interested contractors could meet the CBE-certification requirements without the use of subcontractors, OCFO sought — and was granted — a waiver from such requirements in its IFB. See id., ¶ 27.

Metropolitan attacks these reasons as pretextual and unjustified. It alleges that the market research cited by OCFO as requiring proprietary technology to manufacture instant lottery tickets is "unsupported by any objective evidence." See id., ¶ 31. It notes that OCFO did not even ask manufacturers whether such proprietary technology would actually preclude them from subcontracting with another entity. See id., ¶ 32. Most importantly, Metropolitan points to the two previous RFPs — neither of which prohibited subcontractors, and both of which received bids from joint ventures that subcontracted with CBE-certified enterprises — as evidence that the

6

District's reason for seeking the waiver was simply to avoid contracting with Metropolitan. See id., ¶¶ 33, 34. Plaintiff alleges that the District "discriminated against Metropolitan on the basis of race when the District arbitrarily and capriciously redefined its minimum need[s] . . . knowing that the effect of its action would be to preclude an African-American owned CBE from enjoying any chance of winning" the contract. Id., ¶ 65. Indeed, Plaintiff alleges that as it was the only potential bidder with CBE status (at the time), it "qualified potentially as the sole legitimate and compliant bidder for the subject IFB," id., ¶ 64, and "[a]ll three (3) companies that were awarded the work . . . were white owned ticket manufacturing companies." Id., ¶ 66.

Plaintiff nonetheless submitted a bid in response to this IFB, and, a day later (May 30, 2014), filed a protest action with the CAB. See id., ¶¶ 36, 37. Metropolitan there asserted that the District had unreasonably restricted competition by improperly waiving the otherwise-mandatory subcontracting and CBE requirements. See id., ¶ 37. Several months later, the District canceled the IFB altogether, and Plaintiff alleges it only then learned that the city had instead initiated negotiations directly with the other three entities who had submitted bids in response to the IFB — that is, every bidder except Metropolitan. See id., ¶ 42. Each is white owned and not CBE certified. See id., ¶¶ 64, 66. Metropolitan then filed a second protest with the CAB on August 20, 2014, alleging that the District's cancellation of the IFB and its direct negotiations with bidders was improper. See DCCAB Protest, "Background." The CAB consolidated these two protests and, on March 6, 2015, granted the District's motion to dismiss them. See id. The CAB found — among other things — that the cancellation of the IFB was permissible and that it rendered both of Metropolitan's protests moot. See id., "Discussion." The CAB construed Metropolitan's protest to also allege that the District had acted in "bad

7

faith," but it held that Plaintiff had not met the clear-and-convincing-evidence standard required to prove this allegation. See id.

Before the CAB issued its Order, Plaintiff filed a Complaint in this Court on December 12, 2014, asserting claims against both the District and Buddy Roogow, then-Executive Director of the D.C. Lottery & Charitable Games Control Board, for violations of municipal regulations (Counts I & II), for illegal contracting in violation of District law (Count IV), and for violations of Metropolitan's rights to make and enforce contracts as guaranteed by 42 U.S.C. § 1981 and to be free from discrimination by persons and municipalities acting under the color of law as expressed by 42 U.S.C. § 1983 (Count III). After a hearing before this Court on April 24, 2015, Plaintiff voluntarily dismissed Counts I, II, and IV, and all counts against co-defendant Roogow. Its Amended Complaint, filed on May 8, 2015, proceeds only on Count III. In response, Defendant filed a Motion to Dismiss, which the Court considers here.

## II.    Legal Standard

In evaluating Defendant's Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). This standard governs the Court's considerations of Defendant's Motion under both Rules 12(b)(1) and 12(b)(6). See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."); Walker v. Jones, 733 F.2d 923, 925-26 (D.C. Cir. 1984) (same).

A. Rule 12(b)(1)

To survive a motion to dismiss under Rule 12(b)(1), Plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear its claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  The Court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)).  Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens, 402 F.3d at 1253; see also Venetian Casino Resort, L.L.C. v. E.E.O.C., 409 F.3d 359, 366 (D.C. Cir. 2005) ("Given the present posture of this case — a dismissal under Rule 12(b)(1) . . . — the court may consider materials outside the pleadings."); Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

B. Rule 12(b)(6)

Under Rule 12(b)(6), a court must dismiss a claim for relief when the complaint "fail[s] to state a claim upon which relief can be granted."  As stated, while the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged," see Sparrow, 216 F.3d at 1113, it need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting

9

Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  Though a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555–56 (quoting Scheuer, 416 U.S. at 236).

### III. Analysis

Plaintiff's sole count before this tribunal is that the District discriminated against it on the basis of race in violation of 42 U.S.C. §§ 1981 and 1983.  See Am. Compl., ¶¶ 62-69.  Defendant now urges the Court to dismiss this claim on three grounds.  First, it argues that Metropolitan lacks standing, both because it cannot establish an injury-in-fact and because the Court cannot redress any purported injury.  See Mot. at 15-17.  Second, the city contends that Metropolitan has not exhausted its administrative remedies and thus cannot proceed here.  See id. at 17-20.  Finally, it maintains that the doctrines of claim and issue preclusion also mandate dismissal.  See id. at 20-21.  The Court considers each argument in turn.

#### A. Standing

As a threshold matter, Plaintiff must establish standing to pursue its suit.  Article III of the United States Constitution limits the jurisdiction of the federal courts to resolving "Cases" and "Controversies."  U.S. CONST. art. III, § 2, cl. 1.  A party's standing "is an essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan, 504 U.S. at 560.  To maintain standing, a plaintiff must, at a constitutional minimum, meet the following criteria:

First, it "must have suffered an 'injury in fact' — an invasion of a legally-protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical[.]"'" Id. (citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of — the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" Id. (alterations in original) (citation omitted). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 561 (citation omitted). A "deficiency on any one of the three prongs suffices to defeat standing." U.S. Ecology, 231 F.3d at 24.

Defendant argues that Metropolitan has no standing because it cannot show that it is an "actual or prospective bidder . . . aggrieved in connection with the solicitation or award" — the standard applied by the CAB. See Mot. at 15; D.C. Code § 2-360.03(a)(1). There are two bases for such a position. First, the District asserts that Plaintiff cannot demonstrate an injury-in-fact because at present it lacks CBE certification and thus is "not capable of performing the services solicited in the IFB." Mot. at 16. Second, Defendant maintains that redressability is also absent: because Plaintiff "is not an instant ticket manufacturer," this Court "would not be able to award Metropolitan the contract at issue." Id. at 17.

The Court is not persuaded; indeed, Defendant here begs the question. Metropolitan's claim rests on the allegation that the District altered the requirements of the IFB in order to exclude it. The question is thus not whether Plaintiff is qualified to be an actual or prospective bidder for the IFB in question, but whether the requirements themselves were improperly established to exclude Metropolitan from being a qualified bidder in the first place. That Metropolitan does not possess the requisite CBE certification at present, moreover, does not alter

its standing to sue, for at the time of the alleged events, it was so certified and was thus a qualified bidder. The relief Metropolitan seeks, furthermore, includes business income and other damages for the opportunity it lost <u>at the time it first protested the IFB</u>. Redress is thus achievable. The Court, consequently, finds that Plaintiff has met its burden to establish standing.

    B.  <u>Exhaustion</u>

Defendant next argues that Metropolitan has failed to exhaust its administrative remedies through the CAB protest procedure. A plaintiff, however, is not required to exhaust its administrative remedies as a prerequisite to bringing a claim under either § 1981, see <u>Floyd-Mayers v. Am. Cab Co.</u>, 732 F. Supp. 243, 247-48 (D.D.C. 1990) (citing <u>Johnson v. Ry. Express Agency</u>, 421 U.S. 454, 459–60 (1975)), or § 1983. See <u>Patsy v. Bd. of Regents of State of Fla.</u>, 457 U.S. 496, 512 (1982) ("[F]ederal courts cannot require exhaustion under § 1983."). The District nevertheless contends that this Court should require exhaustion on the basis of the CAB's exclusive jurisdiction over protests of the District's procurement processes. See Mot. at 19 ("[T]here is a defined legislative preference for the resolution of procurement protests with a right of appeal from the CAB to Superior Court . . . ."). In support of this proposition, the District points to the section of the D.C. Code that governs resolution of procurement-contract disputes, a provision of which states that the CAB is the "exclusive hearing tribunal for [a]ny protest of a solicitation or award . . . ." D.C. Code § 2-360.03(a)(1).

The CAB itself, however, has observed that it is a board of narrow jurisdiction, one limited only to contract actions. See <u>Claim of Chief Procurement Officer</u>, DCCAB No. D-1182, 2002 WL 31670688 (D.C.C.A.B. Nov. 29, 2002) ("The Board's jurisdiction is limited to contract actions and does not extend to actions founded in tort."). For example, the CAB has also stated that "[t]his Board has no authority to review . . . constitutional challenges . . . ." <u>Protest of</u>

O'Donnell Const. Co., DCCAB No. P-158, 1992 WL 683780 (D.C.C.A.B. Mar. 24, 1992). The Court thus concludes that Plaintiff's federal claim vindicating the right to be free from discrimination under §§ 1981 and 1983 falls outside the limited jurisdiction of the CAB.

Defendant rejoins that the District of Columbia Court of Appeals has held that contractors bringing claims against the District relating to procurements must exhaust their administrative remedies with the CAB first. See, e.g., Davis & Assocs. v. Williams, 892 A.2d 1144 (D.C. 2006). These cases, however, involve disputes over particular contracts, not claims that the entire solicitation process was unlawfully discriminatory in violation of the Constitution and federal law. See, e.g., id. at 1150 ("[T]here is no doubt that [plaintiff's] claim for money due from the District for services it rendered under the contract constitute a claim related to its contract with the District.").

Defendant also points to other statutory schemes within the District that require administrative exhaustion even over § 1983 claims, such as those brought in relation to the District's Comprehensive Merit Personnel Act. See D.C. Code § 1-601.1 et seq. Courts have, however, found a requirement of administrative exhaustion under the CMPA only because that statutory scheme is — just as its name suggests — comprehensive. The CMPA is "intended . . . to address virtually every conceivable personnel issue among the District, its employees, and their unions — with a reviewing role for the courts as a last resort, not a supplementary role for the courts as an alternative forum." Johnson v. District of Columbia, 368 F. Supp. 2d 30, 40 (D.D.C. 2005) (citation and quotation marks omitted).

That the CMPA was found to require exhaustion of administrative remedies has no bearing on the unrelated sections of the D.C. Code in question here. The CAB's role in the procurement scheme is simply not as comprehensive as that of the administrative board

established under the CMPA. As noted, the CAB has itself stated that it has jurisdiction only over a limited set of claims sounding in contract law. Indeed, "while the Court recognizes [an administrative board's] greater expertise in its specialized field of regulating [certain industries in] the District of Columbia, . . . the judiciary is better-equipped to resolve disputes arising out of allegations of discrimination in violation of federal . . . civil rights statutes" like §§ 1981 and 1983. Floyd-Mayers, 732 F. Supp. at 247. Plaintiff thus need not exhaust its administrative remedies in order to bring its §§ 1981 and 1983 action before this Court.

C. Preclusion

Defendant's final argument is that the Court should dismiss the Amended Complaint under the doctrines of claim and issue preclusion. Here, the city is half right: while Plaintiff's claim is not precluded by the CAB's decision, some of the issues brought before the Board will likely be settled under the doctrine of collateral estoppel. The Court thus may ultimately decline to second-guess certain factual determinations made by the CAB in its Order of March 6, 2015.

1. *Claim Preclusion*

"Under the doctrine of res judicata, or claim preclusion, a subsequent lawsuit will be barred if there has been prior litigation . . . involving the same claims or cause of action . . . between the same parties . . . ." Smalls v. United States, 471 F.3d 186, 192 (D.C. Cir. 2006); see also Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322, 329 (1955) ("[A] prior judgment is res judicata only as to suits involving the same cause of action."). In order for Plaintiff's claim to be precluded here, therefore, it must largely mirror the one brought before the relevant administrative agency — in this case, its protests filed with the CAB. There is no "uniform definition for the term 'cause of action' in connection with the application of res judicata. The term has been given varied treatment depending largely on the facts in each case . . . [; in some]

instances, the court will examine whether the primary right asserted in the two cases is the same." I.A.M. Nat'l Pension Fund, Ben. Plan A v. Indus. Gear Mfg. Co., 723 F.2d 944, 947-48 (D.C. Cir. 1983); see also Hegna v. Islamic Revolutionary Guard Corps, 908 F. Supp. 2d 116, 128 (D.D.C. 2012) (considering, among other factors, "[whether] the same right is alleged to be infringed by the same wrong in both actions").

      Here, Plaintiff's sole claim is one arising under §§ 1981 and 1983 alleging that Defendant discriminated against it on the basis of race when it arbitrarily and capriciously redefined its minimum needs. See Am. Compl., ¶ 65. While much of the factual background mirrors the protests Metropolitan lodged with the CAB — which were dismissed in its Order of March 6, 2015 — Plaintiff did not raise a complaint of discrimination before the Board, which would not have had jurisdiction over a claim grounded in §§ 1981 and 1983. Undeterred, Defendant cites to Univ. of Tenn. v. Elliott, 478 U.S. 788 (1986), which held that state administrative proceedings may have preclusive effect on a subsequent §§ 1981 and 1983 claim as long as the substance of that claim was raised before the agency — even if the administrative agency itself would not have had jurisdiction over §§ 1981 and 1983 claims. See Mot. at 20-21. Yet the crucial difference here is that, whereas the plaintiff in Elliott raised identical claims of a racially motivated discharge before both the administrative law judge and in his subsequent federal lawsuit, see Elliott, 478 U.S. at 791-92, here Plaintiff raises the allegation of unlawful discrimination for the first time in this suit. Claim preclusion requires that the litigants had a fair opportunity to litigate all the issues; where an issue was not fully litigated in the administrative proceedings, such as here, the doctrine is inapt. See Fonville v. District of Columbia, 448 F. Supp. 2d 21, 25-26 (D.D.C. 2006).

2. *Issue Preclusion*

Although Metropolitan's entire claim here is thus not precluded, that does not mean the parties commence litigation before this Court with an entirely clean slate.  Indeed, many of the complaints Plaintiff raises were addressed by the CAB in its Order of March 6, 2015, and this Court will likely be required to give preclusive effect to those factual findings.  "Whereas claim preclusion forecloses all that which might have been litigated previously, issue preclusion treats as final only those questions actually and necessarily decided in the prior suit." I.A.M. Nat'l Pension Fund, 723 F.2d at 949.  In this regard, Defendant is right to cite to Elliott: "[I]t is sound policy to apply principles of issue preclusion to the factfinding of administrative bodies acting in a judicial capacity."  478 U.S. at 797.  To the degree that the dispute between the parties draws on facts that have already been adjudicated and resolved by the CAB, therefore, the Court will defer to such findings going forward. As such findings favor the District, Metropolitan may well face an uphill battle as the case proceeds.

**IV.   Conclusion**

For the foregoing reasons, the Court will deny Defendant's Motion to Dismiss.  An Order consistent with this Opinion shall issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  August 17, 2015